UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITGATION<br><br>This document relates to:<br><br>*Hardeman v. Monsanto Co.*, 16-cv-00525-VC | MDL No. 2741<br><br>Case No. 16-md-02741-VC<br><br>**PRETRIAL ORDER NO. 160: GRANTING IN PART AND DENYING IN PART MONSANTO'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON PUNITIVE DAMAGES; DENYING MONSANTO'S MOTION FOR A NEW TRIAL ON COMPENSATORY DAMAGES** |

This order addresses Monsanto's post-trial challenge to Mr. Hardeman's damages award. The approximately $5 million compensatory damages award is sufficiently supported by the evidence, and Monsanto's request for a new trial on that issue is therefore denied. The jury's decision to award punitive damages is reasonable as well, but the size of the award – $75 million – is constitutionally impermissible. This will be reduced to $20 million, for a total award of $25,267,634.10.

I.

State law governs review of a compensatory damages award in a diversity action. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430-31 (1996); *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008). Under California law, a new trial may be granted on the basis of an excessive award only if "after weighing the evidence the court is convinced from the entire record,

including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." Cal. Civ. Proc. Code § 657; *see also Seffert v. L.A. Transit Lines*, 56 Cal. 2d 498, 507 (1961) (explaining that the trial judge has "the power to weigh the evidence and judge the credibility of the witnesses" when assessing an award).[1] An award need not be tainted by passion or prejudice for the trial judge to conclude that it is excessive. *Seffert*, 56 Cal. 2d at 507 (explaining that while an appellate court may only intervene if an award is "so large as to indicate passion or prejudice," the "power of the appellate court differs materially from that of the trial court in passing on this question"). Here, Monsanto challenges as excessive the jury's $5,066,667 noneconomic damages award, comprised of $3,066,667 in past noneconomic damages and $2 million in future noneconomic damages.

It is easy to uphold the award of past noneconomic damages. Mr. Hardeman presented substantial evidence of his past emotional and physical suffering, including the terror of being diagnosed with non-Hodgkin's lymphoma, the uncertainty surrounding his long-term prognosis, and the debilitating effects of chemotherapy. There is no basis for questioning the jury's valuation of that suffering. *See Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2014).

Looking ahead, Mr. Hardeman is in remission, and Dr. Nabhan, Mr. Hardeman's expert, described his prognosis as "very good," noting that it was "extremely unlikely" his NHL would return. Mr. Hardeman therefore did not seek damages for future physical pain or impairment; the

---

[1] This standard does not appear materially different from the federal standard. *See Williams v. Gaye*, 895 F.3d 1106, 1136 (9th Cir. 2018) (noting that a trial judge "can weigh the evidence and assess the credibility of witnesses" when ruling on a motion for a new trial (quoting *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010))); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) ("A jury's finding of the amount of damages must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork.") (internal quotations omitted).

2

award of future damages is limited to damages for anxiety, mental suffering, loss of enjoyment of life, emotional distress, and inconvenience. There is certainly sufficient evidence to support damages for those future harms. According to Dr. Nabhan's unchallenged testimony, the chemotherapy put Mr. Hardeman at an "increased risk" (albeit an unquantified one) of developing "other types of cancers." He will therefore need lifelong monitoring, including biyearly physical exams and blood tests, to watch for a recurrence of cancer. And with lifelong monitoring comes lifelong anxiety: Mr. Hardeman will live the rest of his life with the fear associated with an increased risk of cancer. Finally, remission is no guarantee. Mr. Hardeman testified that any feeling of safety was only temporary, and soon after each appointment he would again start to "worry about the non-Hodgkin's lymphoma coming back." Cancer is, as Mrs. Hardeman put it, "tenacious," and "you look upon life a little differently after you have gone through" it.

But the size of the future noneconomic award – $2 million – is borderline. The jury valued Mr. Hardeman's past physical suffering and mental anguish at approximately $3 million. That award encompasses the physical pain he endured from the chemotherapy, in addition to the anxiety surrounding his diagnosis, treatment, and long-term prognosis. And his past anxiety, which involved not knowing whether he would live or die, was surely greater than the anxiety suffered by someone in remission. Thus, it is somewhat difficult to rationalize a conclusion that the suffering he will face is, effectively, two-thirds of the suffering he has already endured.[2]

---

[2] Monsanto relies on the ratio of economic to noneconomic damages to argue that the award must be reduced, but medical expenses simply do not provide a meaningful metric for the value of anxiety and mental suffering. Moreover, the case Monsanto cites to argue that California law requires tying emotional distress to economic loss is clearly inapplicable. *See Major v. W. Home Ins. Co.*, 169 Cal. App. 4th 1197, 1214 (2009). That decision involved a bad faith action against an insurance company, and damages for emotional distress were therefore only "compensable as incidental damages flowing from the initial breach [of the insurance policy]." *Id.* (alterations and internal quotations omitted).

However, Mr. Hardeman's counsel raised one point at oral argument that helps mitigate this concern: the jury likely intended the future award to compensate a longer period of suffering. While the past award covers the four-year period from Mr. Hardeman's diagnosis to the trial, his lawyer argued at closing that the jury's award of future damages should account for the next fifteen years.[3] Viewed on a year-by-year basis, the difference between compensation for past and future suffering is within the realm of rationality – roughly $750,000 for each past year and roughly $130,000 for each future year. Recognizing that pain and suffering are inherently hard to quantify, the jury could reasonably conclude that Mr. Hardeman's ongoing fear and anxiety warrants an award that, while significant, is still materially lower on an annual basis than his award for past harm.[4]

Therefore, although it's a close question, the Court cannot conclude, after weighing the evidence presented at trial, that the jury clearly should not have awarded $2 million for future noneconomic damages.

II.

Monsanto raises two challenges to the punitive damages award: (1) any award of punitive damages is unsupported by the evidence; and (2) even assuming some award of punitive damages is appropriate, $75 million exceeds the constitutional ceiling set by the Due Process Clause.

Monsanto is wrong on the first point. Based on the evidence that came in at trial, Monsanto

---

[3] While it would have been improper to instruct the jury on life expectancy, it was permissible for plaintiff's counsel to "ask the jury to measure the plaintiff's pain and suffering on a 'per diem' basis." *Loth v. Truck-A-Way Corp.*, 60 Cal. App. 4th 757, 765 n.8 (1998); *see also* Dkt. No. 3191.

[4] The Court does not find the damages awards in the other cases cited by the parties to be instructive here. Given the differences in factual circumstances – not to mention the substantial discretion afforded to the jury – the awards don't provide much of a compass. *See Seffert*, 56 Cal. 2d at 508 ("Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely.").

4

deserves to be punished. As relevant here, California law provides for an award of punitive damages where the defendant acted with malice, meaning either "conduct which [was] intended by the defendant to cause injury to the plaintiff" or "despicable conduct which [was] carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). It was reasonable for the jury to put Monsanto's behavior in the latter category, because the evidence easily supported a conclusion that Monsanto was more concerned with tamping down safety inquiries and manipulating public opinion than it was with ensuring its product is safe.

But while punitive damages are appropriate, the size of this award is constitutionally impermissible. Unlike compensatory damages, which are designed to redress the harm caused by a defendant's conduct, punitive damages "are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2013). Thus, an award of punitive damages implicates the Due Process Clause's prohibition "of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* To guard against such awards, courts follow "three guideposts" when reviewing an award of punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418; *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).

Starting with the first guidepost, the evidence presented at trial showed that Monsanto's approach to the safety of its product was indeed reprehensible, but there was mitigating evidence as well. While this jury concluded it was more likely than not that Roundup caused Mr. Hardeman's NHL, the metaphorical jury is still out on whether glyphosate causes NHL. The trial showed that

5

there is credible evidence on both sides of the scientific debate, and the repeated approvals of glyphosate by the EPA, the European Chemicals Agency, Health Canada, and other worldwide regulatory agencies, surely diminish – to a degree – Monsanto's culpability. The scientific landscape was even more favorable to Monsanto during the time Mr. Hardeman was using Roundup, because he stopped using it in 2012, while IARC's decision to classify glyphosate as "probably carcinogenic to humans" was not released until 2015. For purposes of this case, to the extent IARC's decision shifted the scientific debate closer to equipoise, Monsanto's conduct as it relates to Mr. Hardeman should be viewed through the lens of the pre-IARC landscape.

Moreover, Mr. Hardeman did not present evidence that Monsanto hid evidence from the EPA or, alternatively, that it had managed to capture the EPA. While Mr. Hardeman presented evidence that Monsanto had a cozy relationship with particular EPA employees, he did not present any evidence that would reasonably support an inference that this relationship rendered invalid the EPA's approval process for Roundup. Nor did Mr. Hardeman present any evidence that Monsanto was in fact aware that glyphosate caused cancer but concealed it, thus distinguishing this case from the many cases adjudicating the conduct of the tobacco companies.

That said, the evidence presented at trial about Monsanto's behavior betrayed a lack of concern about the risk that its product might be carcinogenic. Despite years of colorable claims in the scientific community that Roundup causes NHL, Monsanto presented minimal evidence suggesting that it was interested in getting to the bottom of those claims. *See State Farm*, 538 U.S. at 419 (instructing courts to consider whether the defendant displayed "an indifference to or a reckless disregard of the health or safety of others"). While Monsanto repeatedly intones that it stands by the safety of its product, the evidence at trial painted the picture of a company focused on attacking or undermining the people who raised concerns, to the exclusion of being an objective

6

arbiter of Roundup's safety. For example, while the jury was shown emails of Monsanto employees crassly attempting to combat, undermine or explain away challenges to Roundup's safety, not once was it shown an email suggesting that Monsanto officials were actively committed to conducting an objective assessment of its product. Moreover, because the jury was aware that Monsanto has repeatedly sold – and continues to sell – Roundup without any form of warning label, it was clear that Monsanto's "conduct involved repeated actions," rather than "an isolated incident." *Id.*; *see also Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007).

On the second factor, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426. And it bears repeating that compensatory damages already provide full compensation, so punitive damages are purely an additional sanction. *See id.* at 419. Taking this into account, the Supreme Court has suggested that a four-to-one ratio between punitive and compensatory damages "might be close to the line of constitutional impropriety," and further that "in practice, few awards exceeding a single-digit ratio" will satisfy due process. *Id.* at 425 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991)); *see also Gore*, 517 U.S. at 580-81 (benchmarking the four-to-one ratio against the early English practice of using double, treble, or quadruple damages for certain civil wrongs).

Here, the jury's punitive damages award was approximately 15 times the size of the compensatory damages award. Monsanto's conduct, while reprehensible, does not warrant a ratio of that magnitude, particularly in the absence of evidence showing intentional concealment of a known or obvious safety risk. Indeed, in the first case to go to trial against Monsanto on allegations that Roundup causes non-Hodgkin's lymphoma, Judge Bolanos of the San Francisco Superior Court

7

concluded that a one-to-one ratio of compensatory to punitive damages was appropriate.[5]

Finally, the third guidepost is not particularly helpful here. Monsanto asserts that the punitive damages award exceeds the civil fines available for failure to warn of a product's risks under FIFRA and the California Health and Safety Code, but it fails to identify in any detail what those civil fines are or how they would be calculated. *See* 7 U.S.C. § 136j(a)(1)(E); 40 C.F.R. § 19.4; Cal. Health & Safety Code § 25249.7. Because both state and federal law calculate penalties per violation, it seems entirely possible that Monsanto's liability could, over time, become quite high. But absent an explanation from either party about how these penalties would be calculated, it is difficult to use them as a benchmark.

Guided first and foremost by the nature of Monsanto's conduct, the Court concludes that punitive damages of $20 million – approximately four times the compensatory damages award – is the maximum award that comports with due process. The Court will therefore enter judgment for punitive damages in that amount. *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1151 (9th Cir. 2002) (holding that a new trial is usually unnecessary where "a punitive damages award exceeds the constitutional maximum").

**IT IS SO ORDERED.**

Date: July 15, 2019

                                              Honorable Vince Chhabria
                                              United States District Court

---

[5] Nor does Monsanto's wealth support such a high ratio of punitive to compensatory damages. While a company's worth is relevant when considering the deterrent power of an award, it nevertheless "cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427; *see also Gore*, 517 U.S. at 585 (noting that a "large corporation" is still entitled "to fair notice" of the nature of the penalty a state might impose).